**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MICHELLE LYNN TAYLOR,**

       **Plaintiff,**

**v.**                          **Case No. 3:12-cv-08626**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

**<u>MEMORANDUM OPINION</u>**

This is an action seeking review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The case is presently before the Court on the parties' motions for judgment on the pleadings. (ECF Nos. 8, 9). Both parties have consented in writing to a decision by the United States Magistrate Judge. (ECF Nos. 4, 5). The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

I.    **<u>Procedural History</u>**

Plaintiff, Michelle Lynn Taylor ("Claimant"), filed for DIB in March 2010 alleging a disability onset date of September 4, 2006, (Tr. at 10), due to severe disc degeneration, deformed neck, twisted pelvis with pain in the hips, numbness in the right leg and foot,

attention deficit hyperactivity disorder ("ADHD"), depression with obsessive compulsive disorder, jerking hands and body, muscle spasms in her upper back, arthritis in the lower back, status post back surgery, bulging discs, and head tremors. (Tr. at 151). The Social Security Administration ("SSA") denied the application initially and upon reconsideration. (Tr. at 10). Claimant filed a request for a hearing, which was held on October 20, 2011 before the Honorable Benjamin R. McMillion, Administrative Law Judge ("ALJ"). (Tr. at 26-58). By written decision dated November 18, 2011, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-21). The ALJ's decision became the final decision of the Commissioner on October 4, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

On December 7, 2012, Claimant filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the proceedings on February 11, 2013. (ECF Nos. 6, 7). Thereafter, the parties filed their briefs in support of judgment on the pleadings. (ECF Nos. 8, 9). Accordingly, this matter is ripe for disposition.

## II.   <u>Claimant's Background</u>

Claimant was 26 years old at the time of her alleged onset of disability, 27 years old on her date last insured for DIB purposes, and nearly 32 years old on the date of the administrative hearing. (Tr. at 19, 130). She completed the ninth grade and subsequently obtained CPR and First Aid certifications. (Tr. at 31-32). Claimant has prior work experience as a cashier, assistant manager of a convenience store, dog groomer, and child care worker. (Tr. at 33-34). She communicates in English.

Claimant received DIB and SSI between 1999 and 2003, when the benefits were terminated for administrative reasons. (Tr. at 205). After termination of benefits,

Claimant worked for several years, although during this period, she also applied for and was denied SSI on multiple occasions.

III.  **Summary of ALJ's Findings**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520(a)(4). First, the ALJ determines whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). Second, if the claimant is not gainfully employed, then the inquiry is whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). Third, if the claimant suffers from a severe impairment, the ALJ determines whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does meet or equal a listed impairment, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). In the fourth step, the ALJ

ascertains whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability and the burden shifts to the Commissioner to prove the final step. *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). Under the fifth and final inquiry, the Commissioner must demonstrate that the claimant is able to perform other forms of substantial gainful activity, while taking into account the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the ALJ "must follow a special technique" when assessing disability. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the Regulations. *Id.* § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 404.1520a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in

a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the degree of functional limitation against the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, then the ALJ assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through March 31, 2007. (Tr. at 12, Finding No. 1). The ALJ acknowledged that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since September 4, 2006, the alleged date of disability onset, through March 31, 2007. (*Id.*, Finding No. 2). Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of "chronic lumbar pain with degenerative disc disease (DDD) of the spine, status-post three surgeries; chronic neck pain; nerve tremors; chronic hip pain; head tremors; depression; attention deficit hyperactive [*sic*] disorder (ADHD); and obsessive compulsive disorder (OCD)." (Tr. at 12, Finding No. 3). However, the ALJ found that all other alleged impairments were not severe, as they were responsive to treatment, caused no more than minimal vocational limitations, were not of sufficient duration, or were not medically determinable. (Tr. at 12). Under the third inquiry, the ALJ concluded that Claimant's impairments, either individually or in combination did not meet or medically equal any of the listed impairments. (Tr. at 12-14, Finding No. 4). Consequently, the ALJ

determined that, through the date last insured, Claimant had the RFC to:

> [P]erform light work as defined in 20 CFR 404.1567(b) except that the claimant could never climb and must have avoided concentrated exposure to vibration. She could tolerate no more than occasional interaction with the public, and she could perform work requiring no more than simple, 2-step instructions.

(Tr. at 14-19, Finding No. 5). Based upon the RFC assessment, the ALJ determined at the fourth step that Claimant was unable to perform any past relevant work. (Tr. at 19, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with her RFC to determine if she would be able to engage in substantial gainful activity. (Tr. at 19-28, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1979 and was defined as a younger individual; (2) she had limited school education and could communicate in English; and (3) transferability of job skills was not material to the ALJ's determination that Claimant was "not disabled." (Tr. at 19, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 20, Finding No. 10). At the light level, Claimant could work as a price marker or hotel maid; and at the sedentary level, Claimant could perform jobs such as a sorter and an assembler. (Tr. at 20). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act at any time from the alleged onset date through the date last insured. (Tr. at 21, Finding No. 11).

## IV.   Claimant's Challenges to the Commissioner's Decision

Claimant argues that the Commissioner's decision is not supported by substantial evidence. (ECF No. 8 at 4-10). Claimant contends that "[o]bviously, [her] physical and mental impairments in combination equal a Listed Impairment," or in the alternative

that "her pain, fatigue, and other symptoms are sufficient to establish that she is disabled." (*Id.* at 5-6). More specifically, Claimant asserts that the ALJ (1) improperly evaluated her credibility, (*Id.* at 7-9); and (2) entirely failed to consider her previous awards of DIB and SSI as proof of her disability. (*Id.* at 9-10).

## V.     <u>Relevant Medical Records</u>

The Court has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The Court has confined its summary of Claimant's treatment and evaluations to those entries most relevant to the issues in dispute.

### A. Treatment Records—Prior to Alleged Disability Onset

On July 22, 2004, Claimant was referred to a neurosurgeon, Dr. Rida Mazagri, for evaluation of low back and right leg pain. (Tr. at 283-86). According to Dr. Mazagri's office record, Claimant reported symptoms for several months, which she connected to a March 2004 work-related injury. Claimant, a pet groomer, stated that she was bathing a 100-pound dog when the dog jumped on her. She felt a snap in her back with pain radiating to her right leg. (*Id.*). She started receiving physical therapy, but felt her symptoms had worsened. She denied other health problems. On physical examination, Claimant had mild weakness of the right foot, with otherwise normal muscles. Her deep tendon reflexes were normal, except for absent right ankle reflex. (Tr. at 284). Claimant had decreased touch and pinprick, and a limping gait favoring her right leg. (Tr. at 285). An MRI scan showed a large disc herniation at the right L5/S1 compressing the S1 nerve root. Dr. Mazagri discussed Claimant's treatment options, and she decided to undergo a partial laminectomy and discectomy procedure. (*Id.*).

Dr. Mazagri performed the operation on August 10, 2004. (Tr. at 288-89). Postoperatively, Claimant's symptoms markedly improved. (Tr. at 281). On follow-up

examination by Dr. Mazagri, Claimant was noted to be walking normally and moving her extremities well. (*Id.*). She was instructed to have physical therapy and return for reevaluation in a few weeks. By September 23, 2004, Claimant's leg symptoms were gone, her back pain was reduced to "twinges," but she still had some neck and arm pain that was worse with neck movement. (Tr. at 279-80). Dr. Mazagri ordered additional physical therapy, provided prescriptions for Lortab and Flexeril, and told Claimant to return in a few weeks. On November 11, 2004, Claimant indicated that her neck pain was gone, but she now had some pain in low back and right leg that was alleviated by sitting. (Tr. at 277). She was continued on physical therapy.

On November 29, 2004, Claimant underwent a follow-up MRI of her spine. (Tr. at 294-95). The scan revealed the development of a moderate-sized broad-based disc protrusion at L4-5 and an asymmetrical disc bulge at the L1-2 on the left. Dr. Mazagri examined the film and noted the disc abnormalities, as well as some postoperative scar tissue, but saw no nerve root compression. (Tr. at 274-75). He felt that Claimant's remaining back pain was likely related to her multilevel degenerative disc disease and recommended that Claimant exercise daily and return for reassessment in a few months. (*Id.*).

On April 1, 2005, Dr. Mazagri reevaluated Claimant. (Tr. at 260-61). Her symptoms had markedly improved and "she [was] happy and content with the results of the surgery." (*Id.*). She continued to complain of some residual back pain with occasional radiation to the right leg, but walked normally, had only mild restriction of flexion, and normal straight leg raising, sensation, and muscle strength. After some discussion regarding treatment options, Claimant decided to continue with daily exercises and "see a pain management specialist about nerve blocks to speed up and

facilitate her recovery," as Claimant had not worked since the accident. On September 28, 2005, Dr. Mazagri wrote to a Claims Manager at the Workers Compensation Commission requesting authority to send Claimant to an anesthesia-based pain management center. (Tr. at 257).

Claimant's next medical visit of record occurred in May 2006. (Tr. at 255-56). She presented to Dr. Mazagri complaining of increased back pain with radiation to both legs. She indicated that her job required her to stand, and this was becoming difficult for her. She also reported that she was thirty weeks pregnant. Dr. Mazagri noted that Claimant was walking normally, had normal muscle strength, a negative leg raising, symmetrical deep tendon reflexes, but had some mild restriction of lumbar flexion and extension. (*Id.*). He felt her symptoms were exacerbated by her pregnancy and believed that they would improve with daily exercise and delivery of the child.

### B. Treatment Records—Disability Onset through Date Last Insured

On December 7, 2006, Dr. Mazagri reevaluated Claimant's back and leg symptoms. (Tr. at 251-52).  She complained that her pain had increased and was now associated with tingling, numbness, and radiation into her leg. Dr. Mazagri found Claimant's lumbar extension and flexion to be restricted and her straight leg raising was positive. She also had decreased sensation in her right foot and knee. (*Id.*). He suspected she had another herniated disc and prescribed steroids and pain medication. He ordered a repeat MRI, which showed degenerative disc disease, recurrent herniation at the L5/S1 on the left, presumably impinging on the nerve root, but without evidence of spinal canal stenosis. (Tr. at 292-93). On February 1, 2007, Dr. Mazagri reviewed the results of the scan and suggested that Claimant continue taking pain medication and anti-inflammatory medication, have physical therapy, and consider receiving nerve

blocks at a pain management clinic. He did not recommend surgery at that time.

### C.  Agency Evaluations and RFC Opinions

On December 14, 2006, Claimant was referred to Charley W. Bowen, M.A., licensed psychologist, for an adult mental profile. (Tr. at 298-306). Mr. Bowen conducted a clinical interview and mental status evaluation of Claimant and then administered to her an adult intelligence scale and wide range achievement test. Mr. Bowen noted that Claimant had an abusive childhood with a history of 40 hospitalizations between the ages of 14 and 20 years for attempted suicide and self-mutilation. She described difficulties with trust, paranoia, and obsessive shopping. (Tr. at 299). She also reported feelings of depression, irritability, sadness, anhedonia, and somatic complaints that occurred daily. Claimant was married and lived with her husband and four-month-old child. She explained that she had suffered a work-related injury in 2004 that required back surgery for a herniated disc. She complained of severe pain related to her back and walked with a noticeable limp.

As far as her educational history, Claimant indicated that she had completed the eleventh grade, but dropped out of school in the twelfth grade because she "had no reason to go anymore." (Tr. at 301). She described having behavioral problems in school that resulted in detentions and suspensions. Claimant stated that she had not tried to obtain a GED because she was afraid she would fail. Claimant's reported work history included working for a kennel groomer for two years until she hurt her back in 2004. She remained off work until 2006 when she became a cashier at an Exxon station. (Tr. at 302). She explained that she was fired from that job because she kept moving things after being told not to move them by her supervisor. She then worked at a Go-Mart until she was placed on bed rest secondary to pregnancy-induced toxemia.

On mental status examination, Claimant had adequate grooming and hygiene; her eye contact was fair; her social interaction was mildly deficient; her responses were lengthy; and her presentation was dramatic (Tr. at 302). However, Claimant was alert and oriented, spoke at a normal pace and rate, and her mood was euthymic. Mr. Bowen saw no evidence of flights of ideas or circumstantiality. Claimant's thought processes were normal; her insight was fair; and her immediate, recent, and remote memory was normal. She displayed normal concentration and attention, and her persistence and pace were also normal. (Tr. at 303).

When asked about her daily activities, Claimant stated that she woke early, attended to her personal hygiene, and fed her baby. She usually rested for a while after finishing those tasks. During the day, she cared for her child, prepared a few meals, and did household chores like sweeping, mopping, vacuuming, dusting, and washing the dishes. According to Claimant, she spent several hours each day rearranging her furniture. She also went shopping two or three times each week, and described shopping as her hobby. (*Id.*). Claimant did not belong to clubs or social organizations, but did speak with her mother on a weekly basis and visited a neighbor daily.

Claimant's adult intelligence testing revealed a full scale IQ score of 86, which is in the low average range. Her wide range achievement scores were found to be consistent with her IQ score. (Tr. at 304). She performed arithmetic at a fifth grade level; reading at an eighth grade level, and spelling at an eleventh grade level.

Mr. Bowen diagnosed Claimant with bipolar disorder, borderline personality disorder, and various health problems by report. (Tr. at 305). He felt her prognosis was fair. Mr. Bowen recommended that a payee be appointed to manage any financial benefits she received due to her history of overspending and financial difficulties. (Tr. at

306).

On October 19, 2010, Dr. Rogelio Lim completed a Physical Residual Functional Capacity Assessment at the request of the SSA. (Tr. at 346-353). Dr. Lim noted that Claimant date last insured was March 31, 2007, so he focused his record review on the time period prior to that date. He indicated that Claimant's statements regarding the severity and persistence of her symptoms were not fully credible based upon the medical records in evidence. Pointing to an evaluation in February 2007, Dr. Lim emphasized that Claimant's gait was normal; there was no evidence of myelopathy; and the range of motion in her lower back was only mildly restricted. (Tr. at 353). Thus, Dr. Lim opined that Claimant could occasionally lift and carry 50 pounds; could frequently lift and carry 25 pounds; could stand, walk, or sit six hours each in an eight-hour workday; and had unlimited ability to push and pull. (Tr. at 347). He suggested that she only occasionally climb ramps, ladders, stairs, ropes, and scaffolds. (Tr. at 348). Dr. Lim saw no evidence of manipulative, visual, or communicative limitations. He recommended that Claimant avoid concentrated exposure to vibration and hazards such as machinery and heights. (Tr. at 349-50).

On April 1, 2011, Frank Roman, Ed.D. completed a Psychiatric Review Technique. (Tr. at 371-83). He concluded that there was insufficient evidence in the record to establish any medically determinable mental impairment prior to her date last insured. (Tr. at 383).

### D. Treatment Records—After Date Last Insured

Claimant supplied numerous medical records prepared after her date last insured. The records begin on September 29, 2009, and the last record is dated October 4, 2011. The ALJ reviewed these records as part of his assessment although they are not

particularly relevant to Claimant's condition prior to March 31, 2007. According to these records, Claimant began treatment with Philip Fisher, D.O. at the Huntington Spine Rehab and Pain Center in September 2009. Dr. Fisher treated Claimant with medications, including Valium, Paxil, Nexium, Savella, Norco, Medrol, OxyContin, Neurontin, and Roxicodone. (Tr. at 405-407).

In November 2010, Claimant saw Dr. Panos Ignatiadis for back and leg pain. (Tr. at 358-59). Apparently in May 2010, Dr. Ignatiadis had performed a posterolateral interbody fusion with pedicle screws and rods at the L4/L5/S1 on Claimant's back. She complained of pain at the site of the procedure and ultimately requested removal of the hardware. (Tr. at 360). Dr. Ignatiadis performed the removal procedure in December 2010. (Tr. at 363-64).

On June 5, 2011, Claimant was voluntarily admitted to River Park Hospital for detoxification and treatment for opiate dependence and suicidal ideations. (Tr. at 413). According to Claimant, she started abusing Lortab after receiving them to treat her back pain. Claimant remained hospitalized until June 14, 2011. (Tr. at 408-12). At the time of discharge, Claimant had been successfully detoxified, and was ordered to obtain intensive outpatient substance abuse treatment. (Tr. At 411).

## VI.    **Scope of Review**

The issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has defined substantial evidence as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to

> justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the administrative law judge, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Id.* Instead, the Court's duty is limited in scope; it must adhere to its "traditional function" and "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). Thus, the ultimate question for the Court is not whether the Claimant is disabled, but whether the decision of the Commissioner that the Claimant is not disabled is well-grounded in the evidence, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir. 1987).

The Court has considered Claimant's challenges in turn and finds them unpersuasive. To the contrary, having scrutinized the record as a whole, the Court concludes that the decision of the Commissioner finding Claimant not disabled is supported by substantial evidence.

## VII.   <u>Analysis</u>

Claimant alleges that the Commissioner's decision is not supported by substantial evidence on the ground that her physical and mental impairments in combination equal a Listed Impairment, or in the alternative that her impairments prevent her from engaging in substantial gainful activity. (ECF No. 8 at 5-6). In support of her

contentions, Claimant argues that the ALJ (1) improperly assessed her credibility, (*Id.* at 7-9); and (2) failed to consider her prior awards of DIB and SSI. (*Id.* at 9-10).

### A. Combination of Impairments Equivalent to a Listing

Claimant asserts that "[o]bviously, the [Claimant's] physical and mental impairments in combination equal a Listed Impairment," given that she "suffers from the following: chronic lumbar pain with degenerative disc disease (DDD) of the spine, status post three (3) surgeries; chronic neck and hip pain; head and nerve tremors; depression; attention deficit hyperactivity disorder; obsessive compulsive disorder." (*Id.* at 5). However, she fails to identify which Listed Impairment is supposedly met by her combination of conditions.

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* §§ 404.1525, 416.925. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

Courts in this jurisdiction have repeatedly rejected as meritless arguments like Claimant's where she "does not even attempt to specify which listing" she believes her conditions meet, because it is the claimant's burden to prove that her condition equals one of the listed impairments. *Thomas v. Astrue*, Civil Action No. 3:09-00586, 2010 WL 4918808, at *8 (S.D.W.Va. Nov. 24, 2010); *see also Vance v. Astrue*, No. 2:11-cv-0781, 2013 WL 1136961, at *17 (S.D.W.Va. Mar. 18, 2013); *Berry v. Astrue*, No. 3:10-cv-00430, 2011 WL 2462704, at *9 (S.D.W.Va. Jun. 17, 2011); *Spaulding v. Astrue*, No. 2:09-cv-00962, 2010 WL 3731859, at *16 (S.D.W.Va. Sept. 14, 2010). The Court agrees with this line of cases. In the absence of a focused challenge, Claimant simply does not carry her burden.

Moreover, substantial evidence supports the ALJ's determination that Claimant's combination of impairments does not equal in severity any of the impairments listed. As the ALJ noted, Claimant does not satisfy Section 1.01 (musculoskeletal), specifically 1.02 (major dysfunction of a joint(s)) and Listing 1.04 (disorders of the spine); Section 11.01 (neurological deficits); and Section 12.01 (mental), specifically 12.04 (affective disorders) and 12.06 (anxiety related disorders) because she had no signs "reflective of listing level severity … Also, none of the claimant's treating or examining physicians of record reported any of the necessary clinical, laboratory, or radiographic findings specified therein." (Tr. at 13).  The ALJ appropriately assessed the severity of Claimant's mental impairments using the special technique and found that she had only mild restriction of activities of daily living and social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation of extended duration. (Tr. at 13-14). Claimant also failed to establish any of the Paragraph C criteria contained in Listings 12.04 and 12.06, as her mental impairments had not caused

"repeated episodes of decompensation of extended duration;" had not "resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate;" and had not demonstrated her inability to function outside of a highly supportive living arrangement. (Tr. at 14). The ALJ further noted that "there is no evidence the claimant's OCD has resulted in a complete inability to function independently outside of the area of the home."(*Id.*).

The record lacks any evidence to controvert the ALJ's findings, and Claimant offers no additional evidence to support the bare assertion that her combination of impairments equals a Listing. Therefore, the Court rejects Claimant's contention and finds that the ALJ's determination at the third step of the sequential evaluation is supported by substantial evidence.

### B. Determination of Claimant's Credibility

Claimant contends that the ALJ improperly assessed her credibility by failing to apply the proper legal standards and by failing to adequately articulate the reasons for discounting her credibility. (ECF No. 8 at 7-9). Having carefully reviewed the written decision, the Court affirms the ALJ's credibility determination.

Pursuant to the Regulations, an ALJ evaluates a claimant's report of symptoms using a two-step method. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). That is, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist

some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques. *Id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig v. Cather*, 76 F.3d 585, 595 (4th Cir. 1996); SSA 96-7P, 1996 WL 374186,

at *4-5.

In *Hines v. Barnhart*, the Fourth Circuit stated that:

Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

Social Security Ruling 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover,

the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186, at *4.

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court does not replace its own credibility assessment for that of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ provided a detailed overview of Claimant's testimony, which the ALJ then compared and contrasted with the relevant medical evidence and consultative evaluations, in order to assess Claimant's credibility. (Tr at 15-19). The ALJ found that Claimant's impairments could reasonably be expected to cause the symptoms she alleged, but her statements concerning the intensity, persistence and limiting effects of these symptoms were only partially credible. (Tr. at 17). As the ALJ observed, Claimant's allegations of hip and ankle pain were not supported by the record as she complained infrequently about her hip and ankle, and the MRI scans showed no abnormalities. (Tr. at 18). Similarly, Claimant did not consistently complain of symptoms related to OCD and ADHD and sought no particular treatment for those conditions between the onset of disability and the date last insured. (*Id.*).The ALJ emphasized that Claimant's treatment

for depression had been "essentially routine and/or conservative in nature," which was inconsistent with her claims of disabling depression. He was suspicious of Claimant's complaints regarding back pain, because although they were continuous, Claimant was addicted to prescription medications. Therefore, she "may have been motivated to continue obtaining more pain medication" and exaggerated her pain to suit that purpose. The ALJ indicated that the degenerative changes in Claimant's back were often described as mild or moderate. (*Id.*). He also pointed out that Claimant's daily activities were incompatible with her claims of debilitating pain. Claimant admitted walking and doing housework; frequently moving furniture; caring for her young child; and interacting with friends and family. The ALJ further noted that Claimant's testified that she quit her job in 2006 due to increased back pain secondary to her pregnancy, but then also stated she quit her job and abandoned a prior disability claim because her husband got a better job, and she no longer needed the money. (Tr. at 18). As far as opinion evidence, the ALJ indicated that no treating physician or medical professional opined that Claimant was disabled or that her functional capacity had been limited for a period of twelve months. One of Claimant's treating physicians cautioned her to avoid heavy lifting and not move her furniture as frequently, but that advice was compatible with the RFC assessment made by the ALJ. It is clear from the written discussion that the ALJ conducted a thorough analysis of the relevant evidence, appropriately weighed the medical source opinions, and provided a logical reason for discounting the credibility of Claimant's statements regarding the intensity, persistence, and limiting effects of her symptoms.

Other errors Claimant assigns to the ALJ's credibility determination are likewise meritless. First, Claimant argues that under the "mutually supportive test" recognized in

*Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987), she satisfies the requirements of 42 U.S.C. § 423(d)(5)(A) because her testimony is supported by objective medical source findings. (ECF No. 8 at 7). However, Claimant misinterprets the holding in *Coffman.* There, the issue was not whether the ALJ erred in assessing the claimant's credibility, but whether the ALJ applied the appropriate legal standard in weighing the treating physician's opinion that the claimant was disabled from gainful employment. *Coffman*, 829 F.2d at 517-18. The Fourth Circuit found that the ALJ had misapplied the relevant standard by discounting the physician's opinion due to the alleged lack of corroborating evidence, when the correct standard was to give the opinion great weight *unless* persuasive contradictory evidence was present in the record. *Id.* at 518. As an aside, the Fourth Circuit pointed out that evidence supporting the physician's opinion actually did exist in the record, noting "[b]ecause Coffman's complaints and his attending physician's findings were mutually supportive, they would satisfy even the more exacting standards of. . . 42 U.S.C. § 423(d)(5)(A)." *Id. Coffman* offers no applicable "test" for assessing a claimant's credibility and, consequently, is inapposite. As the written decision in the present case plainly reflects, the ALJ applied the correct two-step process in determining Claimant's credibility.

Second, Claimant argues that the ALJ's use of "boilerplate" credibility language warrants remand on the ground that such language "provides no basis to determine what weight the [ALJ] gave the Plaintiff's testimony." (ECF No. 8 at 8). It is well-established that "ALJ's have a duty to explain the basis of their credibility determinations, particularly where pain and other nonexertional disabilities are involved." *Long v. United States Dep't of Health and Human Servs.*, No. 88-3651, 1990 WL 64793, at *2 n.5 (4th Cir. May 1, 1990). Social Security Ruling 96-7p instructs that

"[w]hen evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individuals statements." SSR 96-7p, 1996 WL 374186, at *4. Moreover, the ALJ's credibility finding "cannot be based on an intangible or intuitive notion about an individual's credibility." *Id.* Rather, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.* Thus, a "bare conclusion that [a claimant's] statements lack credibility because they are inconsistent with 'the above residual functional capacity assessment' does not discharge the duty to explain." *Kotofski v. Astrue*, Civil No. SKG-09-981, 2010 WL 3655541, at *9 (D. Md. Sept. 14, 2010); *see also Stewart v. Astrue*, Action No. 2:11-cv-597, 2012 WL 6799723, at *15 n.15 (E.D.Va. Dec. 20, 2012). To the contrary, the decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *4.

Here, the ALJ admittedly used "boilerplate" language in finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. at 17). However, the ALJ did not stop his analysis with only that bare conclusion. As discussed above, he went on to explain that Claimant's ongoing activities of daily living, her inconsistent testimony regarding the reason she stopped working, the conservative medical treatment reflected in the records, and the lack of objective medical findings supporting the existence of severe

symptoms all tended to undermine her credibility. (Tr. at 14-19). The ALJ's credibility finding was sufficiently articulated, as he explained his rationale with references to the specific evidence that informed his decision. Consequently, the Court finds that the ALJ followed the proper agency procedures in assessing Claimant's credibility and weighing medical source opinions.

### C.  Failure to Consider Prior Award of Benefits

Claimant next argues that the ALJ erroneously failed to consider her two prior awards of SSI and DIB when concluding that she was not disabled. (ECF No. 8 at 10). In Claimant's view, the prior awards not only demonstrate that she was disabled prior to her date last insured, but corroborate her statements regarding the severity and persistence of her pain symptoms. In response, the Commissioner asserts that the ALJ had no duty to consider Claimant's prior awards. The Commissioner stresses that the last benefits received by Claimant were terminated four [*sic*] years before the alleged onset of disability in this case and, equally as germane, Claimant worked during the three-year gap. (ECF No. 9 at 15).

According to information supplied to the ALJ by Claimant, she was awarded SSI from January 1995 through October 1995 and again from September 1999 through September 2003, when her benefits were terminated due to the amount of her spouse's income. Claimant also received Disabled Adult Child benefits from June 1999 through June 2003, which ended when she got married. (Tr. at 205). Subsequently, Claimant reapplied for SSI on four occasions before filing the application at issue in this action. On one occasion, her application was denied due to the amount of Workers Compensation benefits she was receiving. (*Id.*). Two other times, she was denied due to her spouse's income, and on another occasion, she was medically denied at the initial

claims level. No appeal was filed; thus, no written decision was prepared by an ALJ or reviewed by the Appeals Council.

Generally, the "SSA considers the issue of disability with respect to a period of time that was not adjudicated in the final determination or decision on [a] prior claim to be a new issue that requires independent evaluation from that made in the prior adjudication. Thus, when adjudicating a subsequent disability claim involving an unadjudicated period, [the] SSA considers the facts and issues de novo in determining disability with respect to the unadjudicated period." AR 00-1(4), 2000 WL 43774, at *3. Stated another way, the SSA does not consider findings made during the determination of a disability claim to constitute evidence relevant to the determination of a later-filed claim. Nevertheless, in light of the Fourth Circuit's opinion in *Albright v. Commissioner of Social Security,* 174 F.3d 473 (4th Cir. 1999), the SSA has recognized a limited exception to this general rule. In *Albright*, the Fourth Circuit agreed with the SSA that findings made in relation to a prior disability application did not control the findings made on a subsequent application involving an unadjudicated period. However, contrary to the SSA's position, the Court did hold that prior findings were evidence that should be considered and weighed by the ALJ when making his findings on the subsequent application. *Id.* at 477.

Thus, the SSA issued Acquiescence Ruling ("AR") 00-1(4), which explained how it would take into account findings made on a prior application for disability benefits when determining disability on a current application. 2000 WL 43774. The SSA emphasized that AR 00-1(4) had very limited applicability. It pertained (1) only to claims filed within the Fourth Circuit; (2) only to an RFC finding or other finding required at a step in the sequential evaluation process; and (3) only to findings made in

a final decision by an ALJ or the Appeals Council on a prior disability claim. When these three prerequisites were met, an ALJ assessing a later-filed claim was mandated to treat a prior finding as evidence and to weigh it by considering certain factors such as (1) whether the finding is based upon a fact subject to change with the passage of time; (2) the likelihood of such a change in view of the amount of time that has passed between the adjudicated and unadjudicated periods; and (3) the extent that new evidence provides a basis for making a different finding on the subsequent application. *Id.* at *4.

Here, neither party explicitly argues that AR 00-1(4) applies in this case. Indeed, it does not apply given that Claimant's prior awards do not appear to be based on findings by an ALJ or the Appeals Council. Similarly, *Albright* provides no support for Claimant's proposition that the prior awards establish her disability for purposes of this application. The *Albright* Court plainly noted that the "SSA's treatment of later-filed applications as separate claims is eminently logical and sensible," and reiterated its support for the general rule that "separate claims are to be considered separately." *Albright*, 174 F.3d at 476. The *Albright* Court merely recognized that a material finding made by "a qualified and disinterested tribunal" on a prior disability application should be given due consideration in determining a subsequent claim because to do otherwise would "[thwart] the legitimate expectations of claimants—and, indeed, society at large— that final agency adjudications should carry considerable weight." *Id.* at 477-78.

In the present case, Claimant offers no particular findings that should have been considered and weighed by the ALJ. The mere fact that Claimant received benefits in the past does not, on its own, justify a remand in this case given that the probative value of the prior awards is illusory. Claimant's DIB and SSI benefits were terminated in 2003. By her own account, she did not become disabled for purposes of this application until

September 2006, a full three years later. Also by Claimant's own account, she was capable of working for most of those three years, with the exception of a period in 2004 during which she received Workers Compensation benefits for a work-related injury. In any event, the ALJ requested and received information regarding Claimant's past benefits history. Although the ALJ did not discuss the prior awards in his decision, he was not required to do so. *See Harris v. Astrue,* Case No. 2:12–cv–45, 2013 WL 1187151, at *8 (N.D.W.V. Mar.21, 2013). This is particularly true given the marginal significance of the prior awards to the current application. Therefore, the Court finds that the ALJ did not err by failing to expressly consider and assign a specific evidentiary weight to Claimant's prior benefit awards.

Claimant also complains that the ALJ should have retrieved her prior disability files in order to determine the rationale underlying the prior awards. Certainly, an ALJ has the duty to fully and fairly develop the record. However, he is not required to act as Claimant's counsel. *Clark v. Shalala,* 28 F.3d 828 (8th Cir. 1994). *See also U.S.—Reed v. Massanari*, 270 F.3d 838 (9th Cir. 2001); *Haley v. Massanari*, 258 F.3d 742 (8th Cir. 2001); *Smith v. Apfel*, 231 F.3d 433 (7th Cir. 2000). The ALJ has the right to presume that Claimant's counsel presented her strongest case for benefits. *Nichols v. Astrue,* 2009 WL 2512417 *4 (7th Cir. 2009) (citing *Glenn v. Sec'y of Health and Human Servs.,* 814 F.2d 387, 391 (7th Cir. 1987)). Ultimately, "[a]lthough the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008). *See also* Social Security Act, § 223(d)(5)(B), 42 U.S.C.A. § 423(d)(5)(B); 20 C.F.R. § 404.1512(d).

"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001). When considering the adequacy of the record, a court must look for evidentiary gaps that result in "unfairness or clear prejudice" to the claimant. *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. *Brown*, 44 F.3d at 935 (finding that remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant.). In other words, remand is improper, "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).

As previously stated, the ALJ requested Claimant to supply information regarding her prior award of benefits. Claimant provided an email detailing the dates of her applications, the periods during which benefits were awarded, and the reasons for the termination or denial of benefits. Thus, the information available to the ALJ reflected several material facts. First, Claimant did not have a written decision by an ALJ or the Appeals Council. Second, Claimant's benefits terminated a full three years before the alleged onset of disability in this case. Third, Claimant was capable of engaging in work-related activities during the three-year gap as evidenced by her work history and testimony. Finally, Claimant was denied benefits on medical grounds after the termination of her earlier benefits, and she did not appeal that denial. Consequently, the ALJ had adequate information to weigh the significance of the prior awards and did

not need to obtain Claimant's old disability files to resolve her pending disability application. The record before the ALJ was certainly adequate to evaluate whether Claimant was disabled between the alleged onset of disability and her date last insured. Therefore, the Court finds no prejudice to Claimant from the ALJ's failure to obtain the old disability files.

Finally, Claimant asserts that her credibility should "get a boost from the fact that she previously received benefits even before her initial back operation." (ECF No. 8 at 10). Since the nature of the impairments giving rise to Claimant's prior award of benefits is not contained in the record, the Court is unable to logically make the connection suggested by Claimant. In fact, rather than supporting Claimant, the record detailing the time frames of her prior benefits actually tends to weaken her credibility. According to the record, Claimant received benefits until September 2003. (Tr. at 205). At the same time, Claimant states in her Disability Report that she began working at least eight hours five days per week in January 2000. (Tr. at 153). If Claimant's Disability Report is correct, then she was engaged in gainful work-related activity for a period in excess of three years while simultaneously, and improperly, receiving disability benefits. If the Disability Report is incorrect, Claimant's reliability is nonetheless diminished given that she supplied the inaccurate information. The ALJ emphasized that Claimant made contradictory statements in her records and in her testimony. This lack of consistency was one of the reasons that the ALJ discounted Claimant's credibility. Therefore, the evidence submitted by Claimant regarding prior disability awards neither bolsters her credibility, nor provides a basis for remand.

## VIII.  <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  December 3, 2013.

Cheryl A. Eifert
United States Magistrate Judge